UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JODY PETERSEN, | CASE NO. C16-5820-RBL |
| Plaintiff, | ORDER ON SUMMARY JUDGMENT MOTION |
| v. | |
| BRAD GILLASPIE, et al. | DKT. #35 |
| Defendants. | |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #35]. This case arises from a small-town marital dispute between Plaintiff Jody Petersen and her then-husband, Steve. They lived together in Woodland, Washington with their two small children. One night, they argued about Steve seeing another woman, and Petersen threw his clothing on their lawn. Their argument became public when Steve recounted it to his friend, Woodland police officer Defendant Brad Gillaspie. When Petersen, a police officer in nearby North Plains, Oregon, sought a divorce and a protective order against Steve, Gillaspie decided to "jerk her chain" by reporting her conduct to her superior officer, and ultimately, to his own.

The Woodland Police Department commenced an investigation into Petersen (but not, she claims, into her husband), conducted by Gillaspie's friend and fellow officer, Defendant Brent

Murray. Petersen was suspended during the investigation, though no charges were ultimately filed against her. Nevertheless, due to public scrutiny of the case in both towns, Petersen resigned from the North Plains Police Department.

She sues Gillaspie, Murray, Woodland, and its mayor, Grover Laseke. The gist of her claim is that Gillaspie abused his position as a police officer to harass, intimidate, investigate and humiliate her, either to punish her for seeking a divorce from his friend, or to convince her not to do so. She claims Gillaspie and his allies violated a variety of her constitutional rights, including freedom of association, right to petition for redress, and equal protection. She also claims that Woodland knows about and condones Gillaspie's long history of discriminating against women, supporting her *Monell* claim against it.

Gillaspie and Murray seek summary judgment on all of Petersen's claims, arguing they did not violate her constitutional rights and that, even if they did, they are entitled to qualified immunity. Woodland and Laseke also seek summary judgment, arguing that in the absence of a constitutional violation, Petersen's *Monell* claim must be dismissed.

## I.    DISCUSSION

**A.    Factual Background.**

Petersen and Steve tried to save their marriage for three years, to no avail. They were essentially separated at the time of their dispute, though they still lived together. On September 10, 2014, Petersen's son told her he saw Steve "make-out" with another woman in their kitchen. Petersen called Steve, who was out drinking with friends, and yelled at him over the phone. She threw his clothes in their yard and allegedly bleached his work uniform. She texted him that he was a cheater and that his clothes were buried in their yard.

Steve told Gillaspie about the incident that night. Gillaspie encouraged him to report Petersen to the police "if he felt threatened." He did not do so. Two weeks later, Petersen filed for divorce. That night, she returned home to find her children (5 and 6) unattended. She discovered Steve had left them alone to consume alcohol with friends. Petersen called the WPD to report the abandonment. Defendant Officer Murray responded to the call. He claims he called Steve's phone and went to Steve's friends—the neighbor's house—but could not locate Steve.

The next day, Petersen petitioned the Superior Court of Washington County of Cowlitz for a protective order preventing Steve from contacting her or their children, citing Steve's alcohol abuse, philandering, and child abandonment. Petersen found Steve and Gillaspie in her driveway when she returned home. She got out of her car and Steve left, but Gillaspie lingered. He warned her: "You need to work this shit out, Jody. I know all the judges. You will lose everything. Your house. Your kids. Stop being so vindictive and make this shit work."

The Court granted Petersen's TPO, giving her primary custody of her children and sole access to their house until October 9, 2014. Steve moved in with Gillaspie. Gillaspie continued to urge Steve to report Petersen's damaging his clothes to the police. Steve feared she would be fired, which might increase his alimony payments. But Gillaspie persisted: "She needs to go to jail," and that Steve needed to "step up to bat." Gillaspie explained that, if she was arrested, "[i]t would be hard for her to justify going after you for more money." Steve still did not report the incident.

Petersen claims Gillaspie began stalking her, parking his police car outside her home and knocking on her door. His vehicle's GPS confirms he lingered for hours outside her home, and Gillaspie does not deny it. Indeed, when a *guardian ad litem* was eventually appointed to investigate Petersen's and Steve's competency as parents, she interviewed Gillaspie, who

admitted to watching Petersen's house and knocking on her door to "check in on her." He claimed if she was not home she was probably out "cattin' around." He did this often enough that neighbors complained to other officers about his presence.

On October 7, Petersen reported a theft at her house to the WPD. She claimed Steve had violated the TPO by entering their house and taking her lawnmower and computer and rearranging pictures on a wall. Steve stored the taken items at his friend's house. WPD officer Casey investigated but determined the incident to be a civil matter related to the couple's divorce.

The same day, Gillaspie and Murray discussed Petersen's calls to the WPD. Gillaspie told Murray he knew about the Petersens' marital problems, because they had been ongoing for years, and shared his belief that they were the impetus behind Petersen's calls. Murray told Gillaspie he had responded to Petersen's call about Steve abandoning his children. Murray and Gillaspie agreed the Petersen's issues were civil, not criminal, in nature, and wondered together whether Petersen had falsely reported the child abandonment and theft. Gillaspie told Murray about the incident with Steve's uniform (and other clothing), and they discussed whether it amounted to domestic violence. Murray told Gillaspie to check the WPD's officer-involved domestic violence policy. Gillaspie reviewed the OIDV policy and decided the incident did constitute domestic violence and that it required him to report Petersen to both her *Oregon* commanding officer and to his own WPD commanding officer.

The next morning, a month after Petersen had thrown Steve's clothes in their yard, Gillaspie called Steve to tell him he "had" to report the incident to commanding officers from both police departments and that he was "sorry" because he knew Steve had disclosed the information to him as a friend. Gillaspie called North Plains Chief Snyder, and repeated what Steve had told him about the incident. He also reported that Petersen had told him the damage to

Steve's uniform was an accident. Gillaspie told Snyder he did not believe her. Snyder claims Gillaspie also told him he "did not approve" of the TPO because Steve was now "homeless." According to Snyder, Gillaspie asked him to advise Petersen not to "do something to screw herself and to knock the crap off" and to "jerk her chain."

Snyder immediately called WPD Interim Police Chief Mahoney. Mahoney reviewed the WPD OIDV policy. He, too, decided the policy required the *WPD* to investigate the (second-hand) allegations made against Petersen, an *Oregon* police officer. Mahoney assigned Murray to investigate the incident, ostensibly because Murray did not know her, or Steve, and despite the fact that he was Gillaspie's friend, had already been discussing the Petersens' dispute with him, and had responded to one of the calls Petersen had made complaining about Steve. Mahoney was confident that Murray could "conduct a thorough, fair, and impartial investigation."

Mahoney was aware of the potential for a conflict of interest because of Gillaspie's relationship with the Petersens. He ordered Gillaspie to cease all contact with them. Gillaspie ignored this order and talked to Steve on the phone twice. Their first call lasted one minute, but the second lasted thirty-three. Gillaspie claims he called Steve only to inform him they could not associate while the investigation was ongoing and that he did not disclose any information about the case. Mahoney apparently decided Gillaspie's communications with Steve had not interfered with, or influenced, Murray's investigation, and there is no indication Gillaspie was disciplined for disobeying orders. Nor is there any indication of what, if anything, Mahoney did about Gillaspie's "checking up on" Petersen and lingering for hours outside her home in his patrol car.

Snyder placed Petersen on paid administrative leave pending the investigation into whether she had abused Steve. The local paper, *The Oregonian*, published an article about

Petersen's suspension and the investigation (though it did not describe Petersen's underlying marital dispute).

At some point—the record is oddly unclear on the timing—both Murray and Gillaspie served as personal references for Steve during the GAL proceedings, which is somewhat at odds with Mahoney's claim that Murray was assigned to investigate because he did not know either Petersen. Gillaspie told the GAL that during the investigation, Petersen "lied her ass off," and that he felt "she has no business being a cop with that level of dishonestly." He called her "psychotic" and alluded to her having affairs. He also touted Steve's parenting abilities, telling the GAL "that poor guy did nothing but work hard and take care of those kids. He's an excellent father." When prodded, Gillaspie admitted to the GAL that Steve's affairs provoked Petersen. The record is unclear about what Murray told the GAL.

In any event, Murray's investigation involved interviewing Petersen, Steve, and other witnesses, and a review of limited evidence.[1] Petersen claims Murray investigated only the incident that Steve reported to Gillaspie, but he and the WPD failed to investigate her reports that Steve neglected their children, stole her personal belongings, and violated the TPO by entering their house. (Steve ultimately admitted that he took Petersen's personal belongings and stored them at the neighbor's "in order to upset her.")

Ultimately, Murray recommended Woodland City Attorney Fred Johnson charge Petersen with malicious mischief and third degree-domestic violence and telephone harassment. Johnson was not convinced that the witnesses were credible and doubted whether he had sufficient evidence to secure a conviction. He decided not to charge Petersen. But he did talk to the paper

---

[1] The allegedly destroyed uniform was never found. Steve's friends and neighbors, who were also the only other witnesses, apparently provided Murray with a photograph of it.

about his decision, and *The Oregonian* published another article about the case. It had requested the police report and published the details of the underlying incident that had led to the investigation.

Snyder did not discipline Petersen, but Petersen claims the articles tarnished her image and reputation as a police officer to such an extent that she could no longer perform her duties. Petersen and Snyder agreed she should resign from the NPPD, and she did. The Petersens' divorce became final in May 2017.

Petersen sued Murray, Gillaspie, Mayor Laseke, and the City of Woodland. She claims Murray and Gillaspie violated her constitutional rights to associate and to petition the government for redress of grievances by interfering (as police officers) with her employment, divorce, and child custody proceedings. She argues Gillaspie and Murray violated her equal protection right by initiating and conducting the investigation only into her—discriminating against her for being a woman—and not also into Steve. She claims Gillaspie and Murray maliciously prosecuted her by initiating and conducting an investigation without probable cause with an intent to discredit her in the divorce and GAL proceedings, to punish her for filing for divorce, or to persuade her not to follow through with it. Petersen also asserts a *Monell* claim against Laseke and the City. She claims they knew of, allowed, and sanctioned Gillaspie's unconstitutional abuses of power for years.

Gillaspie and Murray argue they did not violate Petersen's constitutional rights and that, even if they did, they are entitled to qualified immunity. Gillaspie claims primarily that he was a "mandatory reporter" under the Woodland OIDV policy, and that if he had not reported what Steve had told him, he could have lost his job. Murray claims he did not violate any of Petersen's rights because he was ordered to investigate her and did so in accordance with WPD policy.

1 Laseke and the City of Woodland argue that in the absence of a constitutional violation,

2 Petersen's *Monell* claim must be dismissed.

3 **B.      Legal Standards.**

4       **1.      Summary Judgment.**

5       Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

6 file, and any affidavits show that there is no genuine issue as to any material fact and that the

7 movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

8 an issue of fact exists, the Court must view all evidence in the light most favorable to the

9 nonmoving party and draw all reasonable inferences in that party's favor. *See Anderson Liberty*

10 *Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *see also Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th

11 Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a

12 reasonable factfinder to find for the nonmoving party. *See Anderson*, 477 U.S. at 248. The inquiry

13 is "whether the evidence presents a sufficient disagreement to require submission to a jury or

14 whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The

15 moving party bears the initial burden of showing there is no evidence that supports an element

16 essential to the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once

17 the movant has met this burden, the nonmoving party then must show there is a genuine issue for

18 trial. *See Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a

19 genuine issue of material fact, "the moving party is entitled to judgment as a matter of law."

20 *Celotex*, 477 U.S. at 323–24.

21       **2.      Qualified Immunity.**

22       Qualified immunity "shields an officer from suit when she makes a decision that, even if

23 constitutionally deficient, reasonably misapprehends the law governing the circumstances she

24

confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).[2] Qualified immunity protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987). The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause [to arrest] is present," qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224 (1991).

**C.      § 1983 Claims.**

To establish a § 1983 claim, Petersen must show: (1) she suffered a violation of her rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under the color of state law. *See Parratt v. Taylor*, 451 U.S. 527, 535

---

[2] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier v. Katze*, 533 U.S. 194 (2001), requiring district courts to decide each question in order.

(1981); *see also Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Gillaspie and Murray do not deny they acted as police officers, and were state actors.

### 1. Right of Association.

#### i. Gillaspie.

Petersen claims Gillaspie violated her First Amendment right[3] to associate (or, more specifically to *not* associate) with Steve by threatening her, stalking her, and initiating an investigation, all to interfere with her divorce. Gillaspie argues that because he was required to report Petersen's allegedly damaging Steve's uniform, he cannot be held liable for any incidental interference his report may have had on her rights. He claims he acted in furtherance of a legitimate government interest, and his actions were not arbitrary or conscious-shocking, in any event.

The Court reviews the viability of a constitutional right to intimate association with a three-part inquiry: (1) whether the interest or right is fundamental; (2) whether the government has interfered directly and substantially with that right; and (3) whether the government has a reasonable justification in the service of a legitimate governmental objective, or whether it is instead "arbitrary or conscience-shocking in a constitutional sense." *See Christensen v. City of Boone IL.*, 483 F.3d 454 (7th Cir. 2007) (citing *Zablocki v. Redhail*, 434 U.S. 374, 386–87 (1978)). An action is "conscience-shocking" when it is taken with an intent to injure and no government interest justifies it. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

First, the right to associate—or to *not* associate—with one's husband is a fundamental right, and Defendants do not contend otherwise. *See Zablocki*, 434 U.S. at 383–386 (marriage is a

---

[3] Defendants correctly point out that the right at issue is actually Petersen's Fourteenth Amendment due process right. *See Lee v City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001). The distinction does not alter the analysis.

protected fundamental interest); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984) (The freedom to associate plainly presupposes a right *not* to associate.).

Second, Petersen claims Gillaspie, as a state actor, directly and substantially interfered with her right to disassociate from Steve. She claims Gillaspie stalked her on police time, threatened her, lied about her, and, when his efforts were unsuccessful, ultimately initiated an investigation into her—with the admitted purpose of interfering with her divorce and child custody proceedings.

Gillaspie denies that he substantially interfered with Petersen's Fourteenth Amendment right. He focusses on what he did *not* do: he did not "restrict, restrain, seize, arrest detain, imprison or otherwise prohibit her association" with Steve. He denies his conduct "shocked the conscience" and that it was arbitrary in a constitutional sense. And, he argues, even if it was, it still did not interfere with Petersen's right to form intimate relationships: she and Steve had been separated for a year and their "intimate" association was irretrievably broken at the time of the investigation. (If their relationship was "irretrievably broken," then this argument calls into question the truthfulness of Gillaspie's assertions that he wanted the Petersens to reconcile their marriage, and that they could. This argument is based on the incorrect assumption that a sexual relationship is necessary for an intimate association, overlooking other important aspects like a shared living situation, finances, and children.)

A government official directly interferes with an intimate relationship when he "directs his statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *Griffin v. Strong,* 983 F.2d 1544 (10th Cir. 1993). Despite his rather conclusory claim to the contrary, a reasonable jury could find that Gillaspie repeatedly and intentionally interfered with Petersen's fundamental, constitutional right to *dis*associate from

Steve by giving misleading statements to the GAL, threatening Petersen, stalking her, and making unannounced visits to her home, all *before* he was "forced" to initiate an OIDV investigation a month later, based on a second-hand report of damaged clothes and some angry text messages.

Viewed in the light most favorable to Petersen, the evidence supports the inference that Gillaspie directly and substantially interfered with her right to associate, or not, by divorcing Steve and protecting their children from him.

Third, Petersen argues Gillaspie had no legitimate reason to use his position of power to execute a personal vendetta against her. She claims Gillaspie contacted Snyder to "jerk her chain" because of the divorce, rather than for a genuine government purpose.

Gillaspie does not really deny, and does not explain, all of the conduct Petersen catalogs. He relies heavily on his claim that, once he discovered it, he had a legitimate governmental interest in reporting the uniform incident to North Plains Chief Snyder under Woodland OIDV policy.

There are at least two problems with Gillaspie's position. First, the policy applies to Woodland Police Officers, not to every officer, everywhere. The policy has laudatory goals, to be sure:

> The Purpose of this policy is to establish clear procedures, protocols, and actions for investigating and reporting of domestic violence involving agency employees and law enforcement officers from other agencies and to thereby discourage and reduce acts of domestic violence by law enforcement commissioned personnel.

Woodland OIDV Policy § 320.12.1. (2014).

But, the "agency employees" to which the policy applies are defined under Washington law as *Washington* police officers: "any person currently employed by a general authority

Washington law enforcement agency." RCW 10.99.020 (1)(6) (emphasis added). And "other

agencies" similarly applies to other **Washington** agencies:

> [A]ny agency, department, or division of a municipal corporation,
> political subdivision, or other unit of local government **of *this***
> **state**[.]

RCW 10.93.020(1) (2006) (emphasis added).

Furthermore, for obvious reasons, the OIDV Policy specifically requires one bound to

report to do so in a timely manner. It uses words like "prompt"[4] and "immediate."[5] Indeed, one

section requires the report to be filed within "24 hours":

> Personnel with knowledge or information about any commissioned
> employee in violation of this policy must report in writing to their
> supervisor as soon as possible, but ***not later than 24 hours***. Failure
> to report may subject the employee to disciplinary action"

OIDV § 320.12.5(2).

Gillaspie heard about the "domestic violence" "incident" a month before he reported it.

Petersen claims Gillaspie's true motives in reporting were instead what he claimed they were to

his friend: to perhaps get her arrested or jailed so that she would re-think her decision to seek a

divorce and child custody. Or, failing that, to ensure she obtained less money from Steve in their

divorce. He asked Petersen's Chief to "jerk her chain." And, she claims, he did it not as her

husband's friend, but as a police officer—a state actor.

A reasonable jury could find that Gillaspie's delay in reporting, and his excuse for the

delay—that he only "discovered" the critical OIDV policy one day before—are instead evidence

that he, and in turn, the government, had no legitimate interest in reporting it, and particularly not

---

[4] "Notification of any incident of domestic violence involving any law enforcement officer requires a *prompt response*...." WPDPM § 320.12.7(1) (2014).

[5] "Any employee who becomes aware of domestic violence committed by a sworn employee must *immediately* report that allegation to their supervisor." WPDPM § 320.12.4(5).

to an out-of-state agency. Gillaspie did not witness the incident, and even in his re-telling it was not "violent," even if it was dumb and perhaps a crime. The policy facially does not apply to out of state officers. Certainly, Gillaspie (and Mahoney) do not seriously contend they are required to report and investigate every story they hear or read about out of state officer-involved property damage. If they commenced an investigation into all such incidents, they would not have a lot of time for the rest of their work.

The final question, then, is whether Gillaspie's actions shock the conscience. Petersen argues Gillaspie's stalking, threatening, and maliciously reporting her does shock the conscience. Gillaspie argues his actions do not rise to the level of constitutional violations, so they do not shock the conscience. He relies on *Christensen v. County of Boone, IL.*, 483 F.3d 454 (7th Cir. 2007).

In *Christensen*, a police officer and his girlfriend were harassed by a deputy Sheriff. The Deputy followed the couple in his squad car, conducted surveillance at her workplace, abandoned service calls and traffic stops to follow them, and parked his car outside businesses they frequented. The couple sued, claiming they had a protectable interest, the deputy directly interfered with their intimate association, his conduct had no legitimate government purpose, and it shocked the conscience. The Seventh Circuit held that while the deputy's stalking may be actionable as a claim for intentional infliction of emotional distress or some other state tort claim, it did not arise to a constitutional violation because it was not egregious: "Watching people from a squad car is very far indeed from the 'most egregious' conduct in which a deputy sheriff can engage. Deputy Krieger did not invade their bedroom or commit mayhem." *Christensen,* 483 F.3d at 464.

Although the Court disagrees with the Seventh Circuit that an officer's stalking a couple only amounts to an "egregious" constitutional violation if he is in close proximity to them, here, Gillaspie's actions do amount to an egregious constitutional violation. By stalking Petersen's home, threatening her, belatedly initiating an investigation that resulted in her losing her job, lying to the GAL about her parental abilities, and tarnishing her reputation in the community, Gillaspie egregiously influenced and interfered with Petersen's divorce and child custody proceedings. A reasonable jury could find he was motivated by malice and a perverse sense of friendship, not by some ethical sense of duty.

Gillaspie does not contend that the right to freely (dis)associate was not clearly established at the time of his conduct. Indeed, *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984), established Petersen's right to associate without undue interference by government actors over thirty years ago. Any police officer knows it is an abuse of power to use his position to force a couple to reconcile or to punish a woman for divorcing her husband. Therefore, Gillaspie is not entitled to qualified immunity. His Motion for Summary Judgment on Petersen's intimate association claim is DENIED.

### ii.    Murray.

Next, Petersen claims Murray interfered with her right to form or to dissolve intimate associations by investigating her and by speaking to the GAL too. Murray argues any impact his investigation had on Petersen's relationships was merely incidental and in the furtherance of a legitimate government interest. He argues his investigation—ordered by Mahoney and conducted in accordance with standard police policy—cannot "shock the conscience."

Mahoney ordered Murray to investigate the Petersens' marital dispute. Petersen offers no evidence that Murray did so illegally, egregiously, or with animus. Her argument that he

interfered with her Fourteenth Amendment right by investigating her—as he was ordered to—if accepted, would mean no officer could ever investigate an allegation of domestic violence without retribution. The Court disagrees with Petersen; Murray did not violate her right to disassociate from Steve.

Petersen's argument that Murray violated her right to associate with her children by speaking with the GAL might have held water, if she had supported her claims. Petersen fails to develop how Murray's testimony allegedly interfered with her right or to even describe it at all. She offers no evidence that Murray lied, threatened, or harassed her. Therefore, without more, the Court concludes Murray did not violate Petersen's Fourteenth Amendment right on this ground either.

Murray's Motion for Summary Judgment on Petersen's Fourteenth Amendment right to freely (dis)associate is GRANTED, and that claim is DISMISSED with prejudice.

### 2.    Right of Redress.

#### i.    Gillaspie.

Petersen claims Gillaspie violated her right to petition the government for a redress of grievances under the First Amendment by initiating a series of government sponsored acts intended to chill or silence her pending divorce proceedings. She argues that after she made her intention to divorce Steve clear, Gillaspie threatened, stalked, intimidated, and reported her with the intent to punish her for divorcing Steve or to stop her from divorcing Steve.

Gillaspie maintains he was required to report Petersen pursuant to a legitimate government interest and any impact the investigation had on her right to divorce was incidental. He argues that if anything, he showed her more deference by waiting to report her, encouraged her to reconcile with Steve, and checking in on her out of concern. Gillaspie also argues he did not interfere with

Petersen's right to divorce and to receive custody of her children because she was granted a divorce and custody. He claims her successful petitions disprove his interference in those proceedings.

The First Amendment right to petition the government for a redress of grievances ensures a government official violates this right if he acts with the intention to "chill or silence a person of ordinary firmness from future first Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cty. [II]*, 192 F.3d 1283, 1300 (9th Cir. 1999). A plaintiff "may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) *cert. denied*, 479 U.S. 1054 (1987) (citing *Laird v. Tatum*, 408 U.S. 1 (1972)). But allegations of "discrete acts of police surveillance and intimidation directed solely at silencing" can amount to a constitutional violation. *Gibson*, 781 F.2d at 1338. The plaintiff bears the burden of proving the defendant's intent. *See Mendocino Envtl. Ctr. v. Mendocino Cty.*, 14 F.3d at 464 (9th Cir. 1994).

Gillaspie engaged in a series of acts to dissuade Petersen from accessing the courts. After she obtained a temporary protective order against Steve, Gillaspie verbally threatened her at her home. He said, "You need to work this shit out, Jody. I know all the judges. You will lose everything. Your house. Your kids. Stop being so vindictive and make this shit work out." He also stalked her, to such an extent she bought her own surveillance system and neighbors complained to police officers in the area.

Gillaspie's primary defense—that he was mandated to report Petersen pursuant to a WPD policy—has already been discredited. He was not a mandatory reporter in this scenario, and it is likely he did not have a legitimate reason to report Petersen's actions to Snyder. A reasonable jury could find Gillaspie's stalking, threatening, and reporting Petersen were all forms of "coercion,

persuasion, and intimidation" aimed at thwarting her access to divorce and child custody proceedings.

Gillaspie's second defense fairs no better. A defendant cannot escape liability merely because a plaintiff eventually persisted in her protected activity. *See Mendocino Cty. [II]*, 192 F.3d at 1300. Gillaspie remains liable for his interference during the Petersens' divorce and custody proceedings, even though Petersen ultimately received a divorce and apparently prevailed in the custody case.

A reasonable jury could find Gillaspie violated Petersen's right to access the courts by intimidating her in an effort to prevent her from doing so. And any reasonable officer would know obstructing a citizen's right to access the courts violates that citizen's constitutional rights. *See, e.g., Delew v. Wagner*, 143 F.3d 1219 1222 (9th Cir. 1998). Gillaspie is therefore not entitled to qualified immunity. His Motion for Summary Judgment on this ground is DENIED.

### ii. Murray.

Petersen claims Murray, too, violated her right to redress by using his position as a government official to initiate a series of actions intended to harass her for seeking a divorce and a protective order. She claims his investigation and suggestion of charges was intended to harm her standing during her divorce and child custody proceedings.

Murray reaffirms his claim that he investigated Petersen pursuant to a legitimate government purpose and that any impact his investigation had on her ability to petition for redress was incidental to, and not the purpose of, his investigation. He argues he was mandated by law to suggest charges; it was not, as Petersen suggests, to harm her position in the divorce.

Petersen's claim against Murray for allegedly violating her right to redress falls prey to the same legal deficiencies as does her allegation that he violated her right to freely associate.

Mahoney ordered Murray to investigate Petersen's marital dispute, and there is no evidence he did so unprofessionally. Murray is required by law to forward his findings to the appropriate prosecutor:

> "The law enforcement agency shall forward the offense report to the appropriate prosecutor within ten days of making such report if there is probable cause to believe that an offense has been committed…"

RCW 10.99.030(9) (2016).

After investigating the incident, Murray claims he had probable cause to forward his report to Johnson with the suggestion Johnson charge Petersen with third degree malicious mischief[6] and domestic violence and telephone harassment.[7] Petersen admitted to throwing his clothes on the yard and damaging his jacket (however, she maintains it was an accident). She also admitted to yelling passionately at Steve on the phone because of his marital indiscretions. According to Murray, and Johnson, he had probable cause to suggest these charges. Johnson, not Murray had discretion over whether to charge or not charge Petersen. Petersen offers no evidence of Murray's intent to obstruct her access to Court. The Court disagrees with Petersen: Murray did not obstruct her divorce or child custody proceedings.

Murray did not violate Petersen's right to petition the courts. His Motion for Summary Judgment on Petersen's First Amendment right to redress claim is GRANTED, and that claim against him is DISMISSED with prejudice.

---

[6] Malicious mischief is defined as "A person is guilty of malicious mischief in the third degree if he or she knowingly and maliciously causes physical damage to the property of another…." RCW 9A.48.090 (2009).

[7] Telephone harassment is defined as "(1) Every person who, with the intent to harass, intimidate, torment or embarrass any other person,[makes] a telephone call to such other person: (a) using any lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act; or … (c) threatening to inflict injury on the person or property of the person called or any member of his or her family household." RCW 9.61.230 (2003).

**3.** **Fourteenth Amendment.**

      **i.** **Gillaspie.**

Petersen claims Gillaspie violated her Fourteenth Amendment equal protection rights by acting with an invidious intent to enforce laws differently because of gender. She claims Gillaspie discriminatorily applied the OIDV policy against her because she is a woman, not because he was a "mandatory reporter." Specifically, she claims he has a history of discriminating against women generally, as evidenced by his sexually-laced comments towards her and his numerous complaints against him as a police officer for sexual harassment. She also claims he treated her differently than Steve after the incident, in his role as a police officer, by reporting her actions only, stalking her on police time, lying to the GAL investigator in favor of Steve, calling her employer to "jerk her chain," and making sexually-laced comments towards her.

Gillaspie argues his valid application of Woodland's OIDV policy and the lack of evidence supporting any disproportionate impact neutralize her claims of bias, defeating her equal protection claim. He argues that even though all of Petersen's harm stems from the OIDV policy, she proffers no argument that she was impermissibly or improperly subjected to it. He argues Petersen has failed to present sufficient evidence that he exhibited an invidious intent or motive to discriminate against her, or against women generally.

Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Gender discrimination is unconstitutional unless it is substantially related to an "achievement of an important governmental interest." *Hibbs v. Dep't of Human Resources*, 273 F.3d 844, 855 (9th Cir. 2001). The Constitution protects males and females alike from discriminatory application, based on sex, of a facially neutral law. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 733,

1  102 S. Ct. 3331, (1982). In order to establish a claim under the Equal Protection Clause, a

2  plaintiff must demonstrate (1) she was treated differently from others similarly situated, and (2)

3  the defendant acted with discriminatory intent. *See Cleburne Living Ctr.*, 473 U.S. at 439.

4      Gillaspie treated Petersen differently than Steve by reporting her actions of "domestic

5  violence" and other infractions but not Steve's. According to Petersen, Steve abandoned their

6  children, entered her house after she received a TPO, and purposefully took her belongings from

7  the house to "mess with her"—the latter of which he admits.  Viewed in the light most favorable

8  to Petersen, the evidence would allow a jury to find that Gillaspie, as Steve's confidant, knew of

9  these acts, but rather than acting as a police officer confronted with a violation of a court order, he

10  chose to dismiss them without further investigation. Indeed, when speaking with Murray,

11  Gillaspie excused Steve's actions as "a civil matter." A reasonable jury could decide Gillaspie

12  chose to overlook Steve's infractions because of their male bond.

13      The question, then, is whether Gillaspie acted with invidious intent to discriminate against

14  Petersen. Petersen cites Gillaspie's history of targeting women and treating women

15  inappropriately based upon their gender as evidence of his intent to discriminate[8]. She also claims

16  he discriminated against her personally by telling multiple people she was "vindictive" and

17  "psychotic," making sexually-suggestive comments about her appearance, requesting Snyder

18  "jerk her chain," stalking, and threatening her.

19      Derogatory or discriminatory comments made by a government official can be sufficient

20  to prove animus. *See Balisteri v. Pacifica Police Department*, 901 F.2d 696, 701 (9th Cir. 1990)

21  (A police officer's comment that he did not blame a victim's husband for hitting her because she

22

---

[8] There are also allegations and strong evidence that this was not the first time Gillaspie treated females unfairly and
23  unprofessionally. Gillaspie has been accused of going through under-aged girls' phones—without probable cause,
permission, or a court order—to look at salacious videos and photos. He would later make public statements to other
24  officers and Woodland officials about the nature of the photographs.

was "carrying on" was sufficient to prove animus.). Gillaspie repeatedly insulted, threatened, and pushed for investigation into Petersen but not Steve. Such comments do not show "deference" to another, but instead show evidence of a vendetta or grudge, or discriminatory intent. A reasonable jury could find Gillaspie acted with an invidious intent to cause harm to Petersen's career, relationships, and divorce proceedings because she was exercising her right as a woman to divorce his friend.

Petersen has provided sufficient evidence to satisfy both elements of an equal protection claim against Gillaspie. A reasonable jury could find he subjected Petersen alone to a Woodlands investigation and harassed her, with bias and discriminatory intent. It is clearly established that police officers cannot discriminate against a person or group of people because of their gender. *See, e.g., Miss. Univ. for Women v. Hogan*, 458 U.S.718, 733, 102 S. Ct. 3331 (1982). Consequently, Gillaspie is not entitled to qualified immunity. His Motion for Summary Judgment on Petersen's Equal Protection claim is DENIED.

### ii. Murray.

Petersen claims Murray applied the OIDV policy disparately because of her gender. She claims Murray only investigated Steve's complaints, not hers, which indicates his bias in Steve's favor. Murray argues Petersen was not treated any differently than any other person, and any claim of bias is neutralized by his conducting the investigation as required by WPD and OIDV policy. He claims that, if anything, he gave Petersen more deference than Steve due to her previous complaints against him. Murray argues Petersen fails to present any evidence of his bias towards her.

Petersen has failed to demonstrate that Murray conducted a one-sided investigation. Murray responded to Petersen's report that Steve had abandoned their children. He investigated

the incident by attempting to locate Steve by telephone and in person. After he could not, Murray recorded Petersen's phone call and his subsequent efforts to speak to Steve about his allegedly abandoning his young children. When Petersen reported a theft at her house, a different WPD officer, not Murray, investigated the incident and determined it was not a criminal but a civil issue. Then, Mahoney ordered Murray to investigate Petersen's domestic dispute. In doing so, Murray investigated the claims against both Steve and Petersen.

During his investigation, Murray interviewed Steve, Petersen (with her lawyer present), their neighbors, Steve's mother, the Petersens' babysitter, and multiple other witnesses and associates. All the witness statements were consistent except for Petersen's. Her inconsistent statements and admissions to throwing Steve's clothes in their yard prompted him to recommend charges against her. Murray's report and investigatory notes indicate he investigated the complaints made against both Steve and Petersen. He determined Steve had not committed any criminal acts and that his story was consistent with the witnesses' sequence of events.

Petersen also provides no evidence Murray was biased against her or that he acted with invidious or discriminatory intent while investigating her.

Petersen fails to support either element of an equal protection claim against Murray. She has not met her burden of establishing a genuine issue of material fact against him. He did not violate her Fourteenth Amendment right to equal protection as a matter of law. Murray's Motion for Summary Judgment on Petersen's Equal Protection claim is GRANTED, and that claim is DISMISSED with prejudice.[9]

---

[9] To the extent Petersen argues Murray violated her right to equal protection through selective enforcement of the laws, Murray did not threaten or actually arrest, seize, cite, or commit any other coercive conduct towards Petersen. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012). The Court DISMISSES this claim.

1        **4.     Malicious Prosecution.**

2        Petersen claims Gillaspie and Murray, without probable cause, intentionally and

3    maliciously instituted a legal action against her. She alleges that in so doing, they deprived her of

4    her right to association, right to file for a protective order, and right to equal protection under the

5    law. Gillaspie and Murray argue that absent prosecution, a malicious prosecution claim cannot be

6    sustained.

7        To maintain a § 1983 malicious prosecution claim, a plaintiff must demonstrate all the

8    elements of malicious prosecution under Washington State law, as well as a resulting deprivation

9    of constitutionally protected rights. *See Haupt v. Dillard*, 17 F.3d 285, 290 (9th Cir. 1994). The

10   five elements under Washington law are: (1) that the prosecution claimed to have been malicious

11   was instituted or continued by the defendant; (2) there was want of probable cause for the

12   institution or continuation of the prosecution; (3) the proceedings were instituted or continued

13   through malice; (4) the proceedings terminated on the merits in favor of the plaintiff, or were

14   abandoned; and (5) the plaintiff suffered injury or damage as a result of the prosecution. *See*

15   *Hanson v. Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993). "Although all elements must be

16   proved, malice and want of probable cause constitute the gist of a malicious prosecution action."

17   *Id*. A criminal proceeding commences when one has been arrested, charged, and brought before a

18   judge. *See Lacey*, 693 F.3d at 919. The absence of prosecution or a criminal proceeding precludes

19   a malicious prosecution claim. *See id* at 919.

20        Petersen was not the subject of prosecution or a criminal proceeding. She was not

21   arrested, charged, brought before a judge, or otherwise subjected to a restraint on her liberty

22   interests. *See id*. She fails to cite any legal authority supporting her argument that initiating an

23   investigation commences a criminal proceeding. If accepted, her argument would chill law

24

enforcement's ability to conduct criminal investigations due to fear of reprisal. Because no criminal proceedings were initiated against her, her malicious prosecution claim fails as a matter of law.

Murray and Gillaspie's Motion for Summary Judgment on Petersen's § 1983 malicious prosecution claim is therefore GRANTED, and that claim is DISMISSED with prejudice.

**D.      § 1985(2) Conspiracy to Interfere with Civil Rights.**

Petersen claims Gillaspie and Murray conspired— because of her gender and with the intent of denying her equal protection of the laws—to hinder, obstruct, and defeat the due course of justice in the State of Washington. However, she offers no evidence from which to infer a conspiracy. Instead, she offers evidence of Gillaspie's—and only Gillaspie's—previous discriminatory conduct against women as proof of his class-based animus.

Gillaspie and Murray ask the Court to dismiss the civil conspiracy claim against them because Petersen lacks specific facts suggesting a conspiracy to violate her rights and has failed to provide sufficient evidence for her claim of class-based animus.

To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of "an agreement or 'meeting of the minds' to violate constitutional rights." *Mendocino Cty. [II]*, 192 F.3d 1300 (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir.1989)). It also "requires an allegation of class-based animus." *Bretz v. Kelman*, 773 F.2d 1026, 1030 (9th Cir. 1985). Men and women can be considered a class. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1537 (9th Cir. 1992) ("It is well-established that gender-based discrimination may result in invidious discrimination.") Circumstantial evidence can be sufficient to prove a conspiracy. *See Mendocino Cty. [II]*, 192 F.3d at 1301.

Petersen fails to provide evidence, circumstantial or direct, from which a reasonable person could infer a conspiracy. She neglects to provide evidence of text messages, conversations, telephone calls, statements made during their depositions, or any other support for a "meeting of the minds" between Gillaspie and Murray from which a reasonable person could infer they conspired against her. Indeed, after Mahoney assigned Murray to investigate "the incident" officially, Mahoney order Gillaspie not to interfere with the investigation and other than his calling Steve, there's no evidence Gillaspie interfered by talking to Murray. Petersen also fails to provide any evidence that both Gillaspie *and* Murray possess an animus towards women. She cites Gillaspie's past discriminatory acts as evidence of his animus, but she fails to provide any evidence of Murray's.

Petersen has not shown that Murray and Gillaspie conspired, with a class-based animus, to hinder her access to the courts or to justice generally. Consequently, Gillaspie and Murray are entitled to summary judgment on Petersen's conspiracy to interfere with her civil rights claim. Their Motion for Summary Judgment on this claim is GRANTED, it is DISMISSED with prejudice.

**E.      Municipal Liability.**

Petersen argues Laseke and the City knew of, allowed, and promoted Gillaspie's allegedly unconstitutional abuses of power for years. Despite Gillaspie's history of civil rights violations and discrimination, Petersen argues Laseke endorsed and encouraged Gillaspie's conduct to such an extent that it became the custom and/or policy of WPD to discriminate against women.

Laseke and the City argue, and demonstrate, that Petersen has failed to establish the existence of a policy or custom endorsed by Laseke because a single officer's misconduct does not qualify as the formal decision by an official policymaker needed to establish *Monell* liability.

1   They argue in the absence of a constitutional violation committed pursuant to an official policy or

2   custom, Petersen's *Monell* claim must be dismissed.

3        To set forth a claim against a municipality under § 1983, a plaintiff must show the

4   defendant's employees or agents acted under an official custom, pattern, or policy that violates the

5   plaintiff's civil rights, or that the entity ratified such unlawful conduct. *See Monell v. Dep't. of*

6   *Social Services*, 436 U.S. 658, 690–91, 98 S. Ct. 2018 (1978); *see also Larez v. City of Los*

7   *Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). A municipality may be liable for a "policy of

8   inaction" where "such inaction amounts to a failure to protect constitutional rights." *Lee v. City of*

9   *Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378,

10  388 (1989)). This custom or policy, "must be the result of a conscious or deliberate choice to

11  follow a course of action made from among various alternatives by the official or officials

12  responsible for establishing final policy with respect to the subject matter in question." *Id.*

13  (citations and internal punctuation omitted). A municipality may not be held liable for the torts of

14  its employees unless they were acting under an official policy or longstanding custom or practice.

15  *Botello v. Gammich*, 413 F.3d 971, 978–79 (9th Cir. 2005). Therefore, to impose liability on a

16  local government entity for failing to act to preserve constitutional rights, a plaintiff must allege:

17  (1) a municipality or its employee deprived plaintiff of a constitutional right; (2) the municipality

18  has customs or policies that amount to deliberate indifference; and (3) those customs or policies

19  were the "moving force" behind the violation. *Id.* at 681–82.

20       Petersen submits Laseke's deposition, and other evidence demonstrating Laseke's

21  knowledge of complaints against Gillaspie, as evidence of Laseke endorsing a discriminatory

22  practice at WPD. In 2015, Laseke was deposed because of a tort claim concerning Gillaspie.

23  Laseke was asked about complaints against Gillaspie that occurred in 2004 and later in 2012.

24

Laseke stated he could not recall the nature of the complaints but explained that he had decided not to discipline Gillaspie because his commanding officer had already taken disciplinary action against him. Laseke's failure to punish a single officer after receiving a few complaints several years ago does not amount to an established official policy or practice to discriminate against women. Consequently, Petersen has failed to identify a custom or policy depriving her of her constitutional right to equal protection.

The City of Woodland and Laseke's Motion for Summary Judgment on Petersen's municipal liability claim is GRANTED and that claim is DISMISSED with prejudice.

## II.     CONCLUSION

Defendant's Motion for Summary Judgment [Dkt. #35] is GRANTED IN PART AND DENIED IN PART. Petersen's following claims are dismissed:

Petersen's right of association, right of redress, and equal protection claims against Murray;

Petersen malicious prosecution and conspiracy to obstruct civil rights claims against Gillaspie and Murray;

and Petersen *Monell* claim against Laseke and City of Woodland's.

Petersen's claim for right of association, right of redress, and equal protection against Gillaspie remain.

IT IS SO ORDERED.

Dated this 23rd day of August, 2017.

Ronald B. Leighton (as auth/dn)
United States District Judge